UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| TERESA L. COLEMAN,  )<br>(Social Security No. XXX-XX-6850),  )<br>)<br>Plaintiff,  )<br>)<br>v.  )<br>)<br>MICHAEL ASTRUE, Commissioner  )<br>of Social Security,  )<br>)<br>Defendant.  ) | 2:08-cv-308-WGH-RLY |

**MEMORANDUM DECISION AND ORDER**

This matter is before the Honorable William G. Hussmann, Jr., United States Magistrate Judge, upon the Consents filed by the parties (Docket Nos. 9, 20) and an Order of Reference entered by District Judge Richard L. Young on August 27, 2009. (Docket No. 26).

**I.   Statement of the Case**

Plaintiff, Teresa L. Coleman, seeks judicial review of the final decision of the agency, which found her not disabled and, therefore, not entitled to Supplemental Security Income ("SSI") benefits under the Social Security Act ("the Act"). 42 U.S.C. § 1381(a); 20 C.F.R. § 404.1520(f). The court has jurisdiction over this action pursuant to 42 U.S.C. § 1383(c)(3).

Plaintiff applied for SSI on February 16, 2005, alleging disability since May 1, 2002. (R. 17). The agency denied Plaintiff's application both initially and on

reconsideration. (R. 56, 52). Plaintiff appeared and testified at an initial hearing before Administrative Law Judge Ann Rybolt ("ALJ") on May 22, 2006. (R. 435-51). After a brief interview of Plaintiff, the May 2006 hearing was continued, and Plaintiff appeared again and testified at a hearing before ALJ Rybolt on December 14, 2006. (R. 374-434). Plaintiff appeared *pro se* at the hearings; also testifying was Plaintiff's husband, a vocational expert ("VE"), and a medical expert. (R. 374). On October 25, 2007, the ALJ issued her opinion finding that Plaintiff was not disabled because she retained the residual functional capacity ("RFC") to perform a significant number of jobs in the regional economy. (R. 17-27). The Appeals Council then denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner. (R. 2-4). 20 C.F.R. §§ 404.955(a), 404.981. Plaintiff then filed a Complaint on July 31, 2008, seeking judicial review of the ALJ's decision.

## II. Statement of Facts

### A. Vocational Profile

Plaintiff was 41 years old at the time of the ALJ's decision and has a tenth grade education. (R. 25, 381). Plaintiff has no past relevant work. (R. 25).

### B. Medical Evidence

#### 1. Plaintiff's Physical Impairments

Over a period of years, Plaintiff's health has deteriorated. She consulted many doctors in an attempt to control her increasingly brittle diabetes; however, for years her glucose levels were often high. The normal range for glucose is 70 to

100/mg/dl. A patient is diagnosed with diabetes when the patient's fasting glucose is 126 mg/dl. Typically, a diabetic non-fasting blood sugar is in the high 100 to 200 range. Plaintiff's diabetes fluctuated wildly, and she was also diagnosed with chronic anemia. Upon exertion, Plaintiff became lightheaded and unsteady. During her menstrual cycle, her hemoglobin levels dropped precipitously, occasionally requiring blood transfusions. Her feet were numb due to diabetic neuropathy, she had recurring "floaters" interfering with her vision, and her legs and ankles tended to swell when she sat for long periods. Further, when walking, Plaintiff was concerned she would fall due to her anemia and the numbness in her feet.

Social Security medical records begin on May 19, 2004, with a visit to Fauzia Ahmed, M.D. Most of Plaintiff's visits to physicians were medical management visits. These visits mostly consisted of a brief recital of her symptoms and then a series of lab results. These visits also attempted to gain control of Plaintiff's diabetes – diabetes which contributed to her anemia. This visit to Dr. Ahmed was typical. Dr. Ahmed, an internist, treated Plaintiff for both anemia and diabetes. Labs on this visit indicated a hemoglobin ("HGB") of 10.7 and a hematocrit ("HCT") of 36.8%. (R. 325).

Plaintiff returned to Dr. Ahmed on November 12, 2004. At that time, she reported a fasting glucose level of 189. (R. 296). Plaintiff's lab work that same day revealed that her fasting glucose was high at 209. (R. 318).

On December 30, 2004, Plaintiff began a treating relationship with Dr. Isaiah Pittman of Providence Medical Group.  (R. 269-70).  Upon exam, Dr. Pittman opined Plaintiff "is a 41y old female who presents with uncontrolled type 2 DM."  He noted her home blood sugar tests ranged in the "200-300s."  (R. 269).  He prescribed a change in medication and recommended she return in two weeks.  (R. 269).  Pursuant to that request, Plaintiff returned on January 6, 2005.  (R. 289-90).  At that time, Dr. Pittman noted her high HGB A1C was indicative of "poor control" of Plaintiff's diabetes.  (R. 289).  Plaintiff's glucose level was 309.  (R. 290).

On January 28, 2005, Plaintiff returned to Dr. Pittman.  At that time, she complained of recurrent chest pains.  Dr. Pittman advised testing for heart disease.  Routine labs revealed a glucose level of 427, HGB of 8.9, and HCT of 27.8%.  (R. 285-86).

Plaintiff's recurrent chest pains caused Dr. Pittman to recommend a cardiac work-up of Plaintiff, and on February 1, 2005, she underwent an EKG.  The test revealed mild concentric left ventricular hypertrophy and an Ejection Fraction of 55% (within normal limits).  (R. 277).  Meanwhile, on February 8, 2005, Plaintiff saw Dr. Ahmed for a follow-up of her anemia.  Plaintiff's blood test continued the trend of being chronically low with readings of HGB of 9.5 and an HCT level of 29.8%.  (R. 360).

On February 15, 2006, Plaintiff presented for a more invasive procedure – a cardiac catheterization.  (R. 279-80).  The catheterization revealed a 30% stenosis

of the Left Main Coronary Artery, but was otherwise normal.  (R. 279).  The technician diagnosed Plaintiff with "mild coronary artery disease."  (R. 280).

A visit to Dr. Pittman's office on March 3, 2005, revealed a glucose level of 150.  (R. 283).

The Indiana Disability Determination Bureau ("DDB") requested that Plaintiff attend an internal consultative examination with Shuyan Wang, M.D., of PSB Medical, on April 27, 2005.  (R. 245-49).  Dr. Wang noted a normal gait and a decreased sensation to pinprick touch on her feet.  (R. 247).  Dr. Wang further reported 3+ edema on her bilateral ankles, and this edema prevented Plaintiff from feeling the pulse on the posterior tibial portion of her ankle.  The range of motion of her ankles was also decreased.  (R. 249).  Dr. Wang diagnosed "Diabetes Insulin dependent, Neuropathy, Bilateral lower extremity edema, Hypertension, Hyperlipidemia, Gastroesophageal reflux disease, Asthma stable, and Obesity."  (R. 249).

At Plaintiff's May 9, 2005 appointment with Dr. Pittman, he also noted the chronic "+3" swelling around her left ankle.  (R. 225).  Plaintiff saw Dr. Ahmed on May 23, 3005, complaining of high home tested glucose and shortness of breath.  (R. 219, 228).  He noted Plaintiff had "uncontrolled" hypertension and had swelling bilaterally in her ankles.  (R. 228).  Her HGB was 8.2, and her HCT was 27.8%.  (R. 219).  He diagnosed Plaintiff with chronic obstructive pulmonary disease, anemia, edema, and uncontrolled hypertension, and he recommended changes to her medication regimen.  (R. 228).

On June 6, 2005, Dr. Ahmed noted continuing edema around her ankles and that her anemia caused GI reflux and nausea. (R. 226). The next day, Plaintiff attended a pulmonary function test at Terre Haute Regional Hospital at the request of the DDB. She attained a post-bronchodilator FEV1 of 1.62 (54% of normal), which is indicative of moderate obstruction. (R. 240-44).

On July 11, 2005, Plaintiff's blood work performed at Terre Haute Regional Hospital revealed a glucose level of 150, but an HGB of 9.7 and an HCT of 30.2%. (R. 126, 137). Blood work on October 6, 2005, from Terre Haute Regional Hospital revealed a glucose level of 291, an HGB of 9.8, and an HCT of 29.8%. (R. 125, 136).

On October 17, 2005, she again submitted blood work at Terre Haute Regional Hospital. At that time, her glucose was 518, her HGB was 10.3, and her HCT was 31.4%. (R. 124, 135). The testing at Terre Haute Regional was arranged by Dr. Tejaswini Kumar of Terre Haute Internal Medicine. On October 24, 2005, he examined Plaintiff. He noted uncontrolled diabetes with edema in the lower extremities. Her glucose level was 185. (R. 128, 145).

Repeat testing on December 27, 2005, at the behest of Dr. Kumar, showed a glucose level of 318. (R. 123). Further testing on December 27, 2005, indicated an HGB and HCT below normal (10.2 and 31.1%). (R. 134). Hemoglobin testing on January 19, 2006, revealed a low A1C HGB of 86.2, indicative of poorly controlled diabetes. (R. 131).

On March 16, 2006, Plaintiff woke up at 5:30 a.m., with numbness on the right side of her body. The numbness resolved after a few minutes, but Plaintiff sought treatment in the Terre Haute Regional Hospital emergency room. Blood work at the ER showed her glucose was 350 and her HGB and HCT, as was typical, were low. The ER doctor diagnosed parathesia, diabetes, and hypertension and urged her to continue to try to get control of her diabetes. (R. 120-122, 133)

On March 22, 2006, Plaintiff saw hematologist Sridbar Bolla, M.D., of the Hope Center. (R. 176-81). At that time, she complained about her chronic anemia and the lightheaded feeling she attributed to it. (R. 176). After his exam, Dr. Bolla noted her HGB was 10.3 and her HCT was 32.2%. (R. 179). He recommended a number of tests to see if the iron in her blood was sufficient. (R. 178). The tests revealed she suffered from low iron. (R. 179-81).

On April 19, 2006, Plaintiff returned to Dr. Bolla after following his prescribed therapy for a month. (R. 182-84). At that time, her HGB was 9.9 and her HCT was 30.7%. (R. 184). He diagnosed her with peripheral vascular disease, in addition to diabetes and anemia. (R. 183).

On April 25, 2006, she again saw Dr. Kumar. On that day her glucose was 175 and her HCT was 28.2%. (R. 127, 132). Dr. Pittman saw Plaintiff again on May 11, 2006. (R. 212-13). He noted her gait was steady, but she continued to have difficulties controlling her diabetes (her glucose was 363) and her left ankle continued to have +1 edema. (R. 212). Dr. Pittman noted her diabetes was

uncontrolled "with an A1C of 13.6%, hyperglycemia, and episodes of proliferative retinopathy." (R. 215). On May 16, 2006, Dr. Pittman diagnosed Plaintiff with proliferative retinopathy. (R. 210).

Problems with blurry vision and black spots in her field of vision caused Plaintiff to see Dr. David Poer, an Opthamologist, on May 17, 2006. At that time, she complained of problems with her vision. Dr. Poer's testing showed a defect in Plaintiff's central fields and that her best corrected acuities were 20/30 and 20/40. He noted "[m]oderately extensive background diabetic retinopathy; cataracts" present in both eyes. In her right eye she presented with proliferative retinopathy with vitreous hemorrhage. He recommended laser surgery as soon as possible to correct the retinopathy. (R. 202-03). Dr. Poer performed successful surgery on May 22, 2006. (R. 194). On May 24, 2006, Plaintiff saw Dr. Bolla in a follow-up. At that time, after several months of treatment, her HGB was 8.1 and HCT was 26%. (R. 185). On May 30, 2006, testing at Dr. Pittman's office showed a glucose level of 250. He further recorded her ankle edema was unchanged. (R. 214). Plaintiff returned to Dr. Bolla for a CBC "drawn per veni from right ACS," which showed an HGB of 8.4 and an HCT of 27.4%. (R. 188-89).

Finally, on January 2, 2007, in a post-hearing submission, Plaintiff submitted a letter from Dr. Pittman. In the letter, Dr. Pittman diagnosed her with "uncontrolled DMII [diabetes], with end organ disease, mild renal insufficiency, peripheral neuropathy, hypercholesterolemia, and profound anemia likely

secondary to chronic disease." He reported her chronic fluid retention would make it difficult for her to stand or walk for any significant time. (R. 364).

### 2. State Agency Review

State agency physicians reviewed the evidence in November 2005 and February 2006 and concluded that Plaintiff could perform limited ranges of light level work. (R. 334-41). In October 2005, state agency psychologist B.R. Horton, Psy.D., concluded that the evidence did not document the existence of a severe mental impairment; this was confirmed in February 2006 by psychologist J. Larsen, Ph.D. (R. 200, 367).

### III. Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997). This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility. *Richardson,* 402 U.S. at 399-400. Accordingly, this court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner. *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, even if reasonable

minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits. *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000).

### IV.  Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that she suffers from a "disability" as defined by the Act. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations set out a sequential five step test the ALJ is to perform in order to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The ALJ must consider whether the claimant:  (1) is presently employed;  (2) has a severe impairment or combination of impairments;  (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity;  (4) is unable to perform her past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy. *Id.* The burden of proof is on Plaintiff during steps one through four, and only after Plaintiff has reached step five does the burden shift to the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

## V. The ALJ's Decision

The ALJ concluded that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. (R. 19). The ALJ found that, in accordance with 20 C.F.R. § 404.1520, Plaintiff has two impairments that are classified as severe: asthma and obesity. (R. 19). The ALJ concluded that these impairments did not meet or substantially equal any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 19). Additionally, the ALJ opined that Plaintiff's allegations regarding the extent of her limitations were not fully credible. (R. 24). Consequently, the ALJ concluded that Plaintiff retained the RFC for light work except that she can only occasionally perform postural activities; she can never climb ladders, ropes, or scaffolds; she cannot work at heights or with hazardous moving machinery; and she should avoid even minimal exposure to chemicals, dust, temperature extremes, and fumes. (R. 22). Plaintiff can occasionally lift and carry 20 pounds and frequently lift and carry ten pounds, and she can occasionally balance, stoop, crouch, kneel, and crawl. (R. 22). Plaintiff can stand and/or walk for a total of four hours during an eight-hour work day. (R. 22). Plaintiff can also sit for a total of six hours during an eight-hour work day. (R. 22). She can occasionally push and/or pull objects weighing 20 pounds and frequently push and/or pull objects weighing ten pounds or less. (R. 22).

However, the ALJ opined that Plaintiff retained the RFC for a significant number of sedentary jobs in the regional economy, including 2,200 assembler

jobs, 300 hand packer jobs, and 500 inspector/tester jobs.  (R. 26).  The ALJ concluded by finding that Plaintiff was not under a disability.  (R. 27).

## VI.  Issues

Plaintiff has raised three issue.  The issues are as follows:

1.  Whether the Commissioner failed to obtain a valid waiver of counsel and subsequently failed the heightened duty to develop the record fully.

2.  Whether the Commissioner erred by designating severe impairments as "non-severe impairments."

3.  Whether the Commissioner erred by presenting an invalid hypothetical to the VE, resulting in a flawed vocational profile.

**Issue 1:     Whether the Commissioner failed to obtain a valid waiver of counsel and subsequently failed the heightened duty to develop the record fully.**

First, Plaintiff argues that the ALJ erred as a matter of law by eliciting an invalid waiver of counsel from her during the administrative hearing, and further failed to fully develop the record.  To ensure a valid waiver of counsel, the ALJ must explain to the *pro se* claimant:  (1) the manner in which an attorney can aid in the proceedings; (2) the possibility of free counsel or a contingency arrangement; and (3) the limitation on attorney fees to 25 percent of past due benefits and required court approval of the fees.  *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir. 2007).  *See also Binion v. Shalala,* 13 F.3d 243, 245  (7th Cir. 1994); *Thompson v. Sullivan,* 933 F.2d 581, 584 (7th Cir. 1991).

At Plaintiff's initial hearing before ALJ Rybolt on May 22, 2006 (R. 435-51), the ALJ advised Plaintiff of her right to counsel as follows:

> Q	Now, before we begin and get into your health care providers, it is my responsibility to ensure that you are aware of your right to representation.  You have a right to be represented at these hearings either by an attorney or a non-attorney so long as that person is competent and knows how to handle a case before the Social Security Administration.  Now, I know in the Notice, the letter you received from us notifying you of the hearing here, some information was provided about attorneys and a list was given of potential sources of attorneys.  Did you understand that information?
> A	Yes.
> Q	Okay.  An attorney or let me say a representative can be helpful in several ways.  They can help you to gather your medical records from hospitals and doctors you've seen.  They can, of course, cross-examine witnesses at the final hearing that we have, and at times an attorney or a representative might bring out some issue or some fact that I otherwise would have overlooked.
> A	Um-hum.
> Q	Okay? [sic]  There is no guarantee -- well let me put it this way.  Your chances of winning your case are not necessarily better because you have an attorney or representative.  Let me point that out.  Everyone wants to know that, you know.
> A	Yes.
> Q	Are my chances better. [sic]  Well I -- we base our Decisions on your medical record and expert testimony that we will have at the hearing, whether it's a physician of some sort or a vocational expert of some sort, so having an attorney can be helpful but I can't say it's going to improve your chances of winning.  In terms of getting your medical records  -- and we're going to talk about -- and updating your medical records in a few minutes here.  I do want to point out that if an attorney -- if you were to hire an attorney and he or she contacts Terre Haute Hospital or any one of your doctors to get an updated medical records [sic], they are going to charge your attorney a fee for that, of course.
> A	Right.
> Q	And then your attorney can ask -- will ask you to reimburse him or her for that fee.
> A	Um-hum.
> Q	Okay? [sic]  Otherwise, the law says that the attorney cannot charge you for his work, his labor, unless you win.
> A	Um-hum.

> Q    So if you were to win your case, I believe it's -- the attorney can charge either 25 percent of the back pay due you, you know, the back benefits due you.
> A    Yes.
> Q    Or up to $5300. Okay?
> A    Yes.
> Q    However, win or lose, you would owe the attorney any reimbursement for the cost of getting the medical records. Okay? If you decide not to have a representative --
> A    Um-hum.
> Q    -- then our office here will write to the hospitals and doctors and request your medical records, and there is no charge to you for that. We will do it. The taxpayers will do it for you. Okay?
> A    Yes.

(R. 437-39).[1] This attempt to advise Plaintiff of her right to counsel was flawed. The ALJ did inform Plaintiff of the benefits of obtaining an attorney. However, the ALJ did not inform Plaintiff of the possible availability of free counsel, nor did the ALJ advise Plaintiff that any fee request by an attorney would have to be approved. Thus, the ALJ failed to satisfy the 7th Circuit's 3-pronged test. Because the ALJ failed to inform Plaintiff of the possibility of free counsel and the need for court approval of any fee arrangement, the ALJ obtained an invalid waiver of counsel.[2]

---

[1] After a nearly seven-month continuance, ALJ Rybolt conducted Plaintiff's second hearing at which time Plaintiff was not provided any additional advice about counsel. (R. 374-434).

[2] While ALJ Rybolt's advice ran afoul of the 7th Circuit's three-pronged test, the court is also concerned about the persuasive tone of the advice she provided. It can be argued that the ALJ diminished the value of an attorney's presence and over-emphasized the costs of an attorney's services, while suggesting that the Social Security Administration can do just as good of a job at obtaining medical records at no cost.

While an ALJ is required to obtain a valid waiver of counsel, the failure to do so does not alone warrant remand. An ALJ's failure to obtain a valid waiver of counsel merely heightens his or her duty to develop the record. *Skinner*, 478 F.3d at 841. When an ALJ fails to adequately inform an unrepresented claimant of the right to counsel, the ALJ must "scrupulously and conscientiously probe into, inquire of and explore for all relevant facts." *Id.* at 841-42. The burden then rests on the Commissioner to demonstrate that the ALJ adequately developed the record. *Binion,* 13 F.3d at 245. If the ALJ fails to satisfy this heightened duty to develop a full and fair record, then Plaintiff is entitled to a remand based on inadequate notice of the right to representation.

In this case, the ALJ failed to satisfy this heightened duty to develop the record in several distinct ways. First, the ALJ's decision was not rendered until October 25, 2007. Yet, the medical records that the ALJ relied on were all at least nearly 18 months old; the most recent being records from May 2006.[3] A more scrupulous and conscientious probe into all of the relevant facts would have required a more recent update of Plaintiff's medical condition.[4]

---

[3]The only medical record more recent was a letter from Dr. Lynn Pittman which the ALJ rejected as not consistent with Plaintiff's other medical records. (R. 364).

[4]This is especially true given the fact that the ALJ rendered her opinion on October 25, 2007, and the Social Security Administration found Plaintiff disabled, after Plaintiff filed a new application, a mere seven months after the ALJ's decision. It is quite possible that the Social Security Administration relied on evidence in Plaintiff's second application that the ALJ could have uncovered had she engaged in the type of examination of the record required by her failure to obtain a proper waiver of Plaintiff's right to counsel.

Second, the ALJ relied on one report from Plaintiff within the record to conclude that Plaintiff's diabetes was well controlled with the use of the insulin drug Levemir. (R. 20). However, the May 30, 2006 record that the ALJ relied on (R. 214) clearly indicates that Plaintiff suffered from uncontrolled diabetes mellitus with proliferative retinopathy, and it indicates that while Plaintiff herself reported a blood sugar in the range of 100-120, the actual testing revealed a blood sugar of 250. Many other readings throughout Plaintiff's treatment history revealed uncontrolled diabetes. In January 2005, Plaintiff had glucose levels of 309 and 427. (R. 285-86, 290). In October 2005, her glucose levels were 290 and 518. (R. 124, 135-36). Finally, on January 2, 2007, Dr. Lynn Pittman referred to Plaintiff's diabetes as "uncontrolled." (R. 364). Thus, the ALJ's characterization of Plaintiff's diabetes as well controlled reveals her failure to engage in a scrupulous and conscientious probe of all of the facts.[5]

Third, the ALJ concluded that Plaintiff's anemia was not severe. (R. 21). However there does not appear to have been any attempt by the ALJ to determine whether or not Plaintiff's anemia met Listing 7.02 in 20 C.F.R. Part 404, Subpart P, Appendix 1. The objective medical evidence clearly indicates that Plaintiff had anemia that was severe enough to meet at least the first prong of Listing 7.02 which requires "hematocrit persisting at 30 percent or less due to any cause." Plaintiff had HCT levels that were below 30 percent in January 2005, February

---

[5] See *Myles v. Astrue*, __ F.3d __, 2009 WL 2870616 (D. Ill. Sept. 9, 2009), for a discussion by the Seventh Circuit of diabetes and related issues that require explanation by an ALJ.

2005, May 2005, July 2005, October 2005, April 2006, and May 2006.  (R. 124, 126-27, 132, 136-37, 185, 219, 228, 285-86, 360).  Given the ALJ's heightened duty to develop the record, her failure to adequately address Plaintiff's anemia also warrants remand.

A fourth, and final, problematic area concerned Plaintiff's retinopathy.  Despite significant testimony from Plaintiff about the problems she was having with her vision, including scaring her daughter by running a stop sign and almost striking a group of pedestrians, curiously the ALJ proclaimed that Plaintiff "described no impact upon her functionality resulting from her retinopathy."  (R. 24).  The record, however, is clear that Plaintiff had a form of retinopathy called proliferative retinopathy which had required one laser surgery in May 2006.  (R. 194).  Medical literature indicates that this form of retinopathy causes scar tissue to develop on the eye and, even after laser surgery, "treatment prevents blindness, but often some vision is lost."  See diabeticretinopathy.org.uk, Proliferative Retinopathy, http://medweb.bham.ac.uk/easdec/proliferative.html (last visited Sept. 30, 2009).  Despite Plaintiff's testimony of deteriorated vision and the very real possibility that laser surgery can reduce a diabetic's vision, the ALJ made no attempt to engage in a scrupulous and conscientious probe of all evidence, including the possibility of re-contacting Plaintiff's eye doctors for followup medical records in the nearly 18 months between the time in May of 2006 when Plaintiff's medical records end and the ALJ's October 2007 decision.

In conclusion, ALJ Rybolt failed to obtain an adequate waiver from Plaintiff of her right to counsel at the administrative hearing. She further failed to engage in a scrupulous and conscientious probe of all the relevant medical evidence. Therefore, the ALJ's decision must be remanded.

**Issues 2 and 3:**

As remand is necessary because the ALJ failed to obtain a valid waiver of Plaintiff's right to counsel and failed to adequately develop the record, the court need not address Plaintiff's remaining arguments.

## VII.  Conclusion

For the reasons discussed above, the court cannot trace the path of the ALJ's reasoning. The ALJ failed to obtain an adequate waiver of counsel from Plaintiff. Furthermore, the ALJ failed to engage in a scrupulous and conscientious probe of all the relevant medical evidence. The decision of the Commissioner is, therefore, **REMANDED**.

**SO ORDERED.**

**Dated:**  September 30, 2009

William G. Hussmann, Jr.
United States Magistrate Judge
Southern District of Indiana

**Electronic copies to**:

Annette Lee Rutkowski
KELLER & KELLER
annette@2keller.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov